## PAUL v. PRINCE.   (No. 7968.)

(Court of Civil Appeals of Texas. Galveston. Feb. 15, 1921. Rehearing Denied March 17, 1921.)

1. **Appeal and error** ⬁**1011(1)—Finding of lower court on conflicting testimony conclusive.**

Where evidence conflicted as to a matter in a brokerage contract, appellant is precluded from complaining of that feature of the adverse judgment; the finding being sufficiently supported by the testimony.

2. **Brokers** ⬁**86(7)—Facts held to show vendor's agent accepted commission from purchaser, so as to constitute double agency.**

In a real estate broker's action against vendor for commission, evidence *held* to show that a payment by purchaser to plaintiff was neither a mere subsequent gratuity, nor an exclusive consideration for services in an independent matter, but was connected with the transaction, thus establishing a double agency; plaintiff's acceptance of the agreement with the purchaser being shown by his acts.

3. **Brokers** ⬁**65(4)—Forfeiting commission because of undisclosed dual relation does not depend on the principal's sustaining a loss or broker's bad faith.**

In broker's action against vendor for commission, failure of evidence to show plaintiff's bad faith or actual loss to his principal, flowing from his acceptance of compensation from the purchaser, does not prevent plaintiff's forfeiture of the agreed commission, since forfeiture follows the mere existence of the undisclosed dual relation, as the exaction of a sound public policy.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Suit by Allen Paul against H. Prince. Judgment for defendant, and plaintiff appeals. Affirmed.

Presley K. Ewing and A. C. Allen, both of Houston, for appellant.

Louis, Campbell & Nicholson and W. A. Combs, all of Houston, for appellee.

GRAVES, J. Paul, as a real estate broker, claiming that he had duly performed the specified services, in that he had sold the property as agreed, and that Prince had refused to pay the commission, sued the latter upon this written contract:

"Houston, Texas, July 5, 1919.

"I agree to pay Allen Paul thirty-five hundred (3,500.00) dollars commission on the sale of lot 1, in block No. 44, in the city of Houston, this commission to be paid when deed is passed to said Allen Paul's purchaser, as commission for making the sale.   [Signed] H. Prince."

The lot had on it what is known as the Lumberman's National Bank building. Plaintiff averred that he sold the property to Sakowitz Bros., a corporation, for $250,000,

which sale the defendant accepted and ratified by making deed accordingly to the purchaser, whereby he became liable to plaintiff for the commission fixed in the contract declared upon.

In so far as is material here, the defendant answered with these two defenses:

(1) That the agreement for compensation was at first $2,500, but was increased to $3,500 under the false representation of the plaintiff (upon which defendant relied) that he had been compelled to engage assistant agency services towards financing the purchaser in order to enable it to buy, and that for this reason the compensation should not exceed $2,500.

(2) That the plaintiff was not entitled to recover the $2,500, or any amount, because, as alleged, he had, pending the transaction for the sale, and before its closing, without the knowledge of defendant, accepted employment from the purchaser corporation, Sakowitz Bros., and agreed with it to use his services to obtain the property at its price, to wit, $250,000, for a remuneration to be received by him, and which was afterwards paid to him.

In a supplemental pleading plaintiff vigorously denied these allegations of false representation and of disloyalty, but declared that, to use the language of his brief:

"After the sale transaction in question was closed, said purchaser gave him $2,500 for his services in an independent matter relating to the acquisition of certain leases by it, and wholly as a gratuity concerning the sale transaction in question, and without the slightest legal obligation on the purchaser's part in that respect."

The court tried the cause without a jury and rendered judgment denying the plaintiff any recovery; he appeals, attacking different features of the following findings of fact and the conclusions of law, filed by the court below at his request:

"Findings of Fact.

"A short time before July 5, 1919, defendant employed plaintiff to sell the property known as the Lumberman's National Bank building in Houston, for which service defendant agreed to pay plaintiff $2,500. After some negotiations with Sakowitz Bros., who had offered $250,000 for the property, and who afterwards bought the property, plaintiff submitted to them an offer to sell at $275,000, that being the sum then demanded by defendant, and Sakowitz Bros. reiterated to plaintiff their counter offer to pay $250,000, declaring that sum to be their ultimate offer.

"On the morning of the day during which the trade was closed, or the day prior to that, Mr. Levy, acting for Sakowitz Bros., told plaintiff to go back and see Mr. Prince again, and if he could buy the property at their (Sakowitz Bros.') price (at the price they had named), and aid them in securing a lease upon the ad-

joining property, that they would give him $2,500.

"Plaintiff had substituted the offer of $275,-000 as defendant's ultimate selling price, and thereupon stated to Mr. Levy, who represented Sakowitz Bros., that he did not believe defendant would accept that sum. He did not further attempt to procure a better offer from the buyers, but at once went to defendant and submitted to him the proposition made by Mr. Levy. He called defendant's attention to the fact that the property was under a long term lease at low rental, and that taxes are high, and that it was bringing only negligible net revenue on the investment, and that the Levy offer was a good one, and defendant would not be able to get a better offer.

"He did not disclose to defendant the offer of Levy to pay him $2,500 to procure the purchase at $250,000, and defendant knew nothing of such offer until after the sale.

"Prince agreed to sell for $250,000, and a contract of sale was executed between him and Sakowitz Bros., and $10,000 earnest money paid to defendant by Mr. L. Sochat, who represented Sakowitz Bros.

"After Prince had agreed with plaintiff that he would sell to Sakowitz Bros. at $250,000, plaintiff then stated to defendant that there was another broker in the deal, who was getting financial assistance to the purchasers to enable them to close the deal, and that in order for the deal to go through it would be necessary for plaintiff to split or divide his commission with such other broker, and that the $2,-500 which defendant had promised to pay plaintiff was too small to split, and that the defendant would have to add another $1,000 to the commission. Whereupon defendant, rather than see the deal fall through at that state of the proceeding, and relying upon such representations, agreed in writing to pay plaintiff $3,500 if the sale was made by him.

"There was no other broker in the deal with whom Paul had to or expected to divide his commission, and Paul's representations in that respect were untrue.

"A short time after the earnest contract was signed, Sakowitz Bros. paid plaintiff the $2,500 which they had promised him in the event they were able to purchase the property at their price.

"Plaintiff was the procuring cause of the sale. Sakowitz Bros. promised plaintiff $2,500 substantially to induce him to procure defendant to accept their terms, and plaintiff, knowing that purpose for which such offer was made, tacitly accepted same, and did not further urge them to raise their offer, and proceeded to secure from defendant the closing of the deal on their terms, and that as to such further service he was, after such offer was made to him as to the price to be paid, acting for the benefit of the purchasers.

"Conclusions of Law.

"The plaintiff cannot recover the additional $1,000 added to the agreed commission by defendant because of plaintiff's misrepresentations in reference thereto, and cannot recover the $2,500 first agreed on, for the reason that his duty to the defendant was to secure the highest possible price for the property and give to defendant the full benefit of his skill, ability, counsel, and advice. His acts in accepting the offer of the buyers, and in immediately securing the closing of the deal on terms dictated by them, and accepting from them the commission which they agreed to pay him, are adverse to the duty he owed defendant, and are contrary to public policy, and avoided the contract of defendant to pay him a commission.

"Ewing Boyd,
"Judge 55th Judicial District of Texas."

[1] As affects the $1,000 of the contract amount sued for, which the court thus found to have been added to the commission originally agreed upon, the appellant concedes there was a conflict of testimony, and that he is on that account precluded from complaining here of that feature of the adverse judgment below. The concession follows the record, since the finding has sufficient basis in the testimony; that much of the cause of action declared upon is therefore removed from further consideration.

[2] As concerns the claim for $2,500, the correctness of the judgment below depends upon whether or not there was also sufficient evidence to support the court's further finding of fact and consequent conclusion of law that the well-settled rule against a double agency on the part of a real estate agent had been offended. After a most careful review of the statement of facts, this court concludes that there was; at the same time it fails to find that any lack of good faith about the matter on the part of appellant was shown, or that the price obtained for the property was not all it was worth, and all that the purchaser would in any event have paid for it.

Here, too, we think, and contrary to the earnest contentions of the appellant, there were at most only such conflicts in the testimony touching the matter of a dual agency with reference to the sale and purchase of the bank building as the trial court had the authority to resolve; for instance, the appellant not only pleaded, as has above been mentioned, but testified, that the payment of the $2,500 had nothing to do with the sale of the building, but was made to him after that had been closed solely for his services in connection with the leases Sakowitz Bros. desired on other properties, he said:

"Sakowitz Bros. told me they would pay me $2,500 if I could get these leases. * * * The $2,500 was accepted by me from Sakowitz Bros. in full remuneration for services rendered and to be rendered on the leases. * * * It is a fact that the matter of Sakowitz Bros. paying me this $2,500 was not mentioned between me and them until after the trade had been entirely closed between them and Prince. It is also a fact that they paid me the $2,500 in cash in advance for such services as I might render in the next three or four years in helping them to get a lease on the other three pieces of property; that is my testimony."

On the other hand, both the witnesses Simon Sakowitz and Ben M. Levy, the latter being secretary of the purchasing corporation, repeatedly swore that appellant was told, before the deal was closed, that if he could buy the building at their price, and would continue working on the leases, they would give him $2,500, and that they did pay him that sum for those two purposes. Levy testified in part:

"Sakowitz Bros. paid Mr. Paul $2,500 for closing this Prince deal and doing some other work for us; the other work being he endeavored to secure a lease on the adjoining property to the Prince. He did not procure it. * * * Well, nothing was said then about paying him anything by us for purchasing the property for us until the day that the purchase was made, or, the day prior to that. He came back with a proposition in which he said Mr. Prince had reduced his price to us on the property, but still not within the price we wanted to pay for the property, and I told him to go back and see Prince again, and if he could buy the property at our price, at the price we had named, and secure for us the adjoining property by lease, that we would give him $2,500. The price we had named was $250,000. He told me right at that time, he says, 'There is no use in going back; Mr. Prince won't take less than he told me.' I said, 'You go back anyway.' He was not to repay the $2,500 in the event he was unable to secure the lease on the Meyer property; he was to continue to try to get the lease for us. We were not paying him $2,500 in advance for his services he might render in trying to get the lease from Mr. Meyer. All these conversations between myself and Paul about paying this $2,500 occurred before the deal was finally closed. * * *

"As to the $2,500 we paid Mr. Paul: He told me that if he didn't get the lease on the adjoining property for us at that time that he would continue to work for us without further compensation. I told him the day that the deal was closed, or the day prior, that if he would make the deal at the price we stipulated we would give him this amount of money, provided he continued to work on the other leases. That was my suggestion. It didn't come from him. * * * We hired Mr. Paul to secure the Prince building for us at $250,000. We told him we would purchase it, if he could get it at that price, and if he could, and would work on the leases, we would pay him $2,500."

In the main these statements were substantially reiterated by Sakowitz. It was further undisputedly shown that, after receiving this ultimatum from those acting for the purchaser as to the price it would pay, the appellant did go back to Mr. Prince, and the sale at their price of $250,000 at once ensued; the latter testifying on this trial that he had known nothing about Sakowitz Bros. paying Mr. Paul a commission until after this suit was filed.

The testimony last quoted furnished sufficient basis for a finding that the admitted payment was neither a mere subsequent gratuity, as concerns the sale of the building, nor an exclusive consideration for services in an independent matter, that in relation to the leases on adjoining property. It is true no formal acceptance by appellant of this proposal to pay him the $2,500 so stated to have been made was shown; but that was not necessary, as acceptance was a legitimate inference from what the court otherwise found he had done. Simpkins on Contracts (3d Ed.) pp. 21 and 23; Mechem on Agency, vol. 1 (2d Ed.) p. 17, § 31; also page 19, § 34, and page 183, § 253; Corpus Juris, vol. 2, p. 435, §§ 31 and 32; A. & E. Ency. of Law (2d Ed.) vol. 7, p. 130; Bishop on Contracts, par. 87; Rose v. Railway Co., 31 Tex. 49.

[3] A double agency having been by the court below so found to exist, and its legal effect as causing a forfeiture of the agreed commission declared, the attack upon the judgment rendered cannot prevail. Neither does the failure of the evidence to show bad faith in the agent, or actual loss to his principal flowing from his acceptance of compensation from the other side, in any wise undermine this result. The penalty denounced follows the mere existence of such an undisclosed dual relation as the exaction of a sound public policy. The law has been often so pronounced, a succinct and clear statement of it being this from Bass v. Tolbert, 51 Tex. Civ. App. 440, 112 S. W. 1078, under italics of our own:

"It is well settled that an agent who is relied upon to exercise, in behalf of his principal, his skill, knowledge, or influence, will not be permitted, without his principal's knowledge and consent, to undertake to represent the other party to the transaction; and *it makes no difference that the principal was not in fact injured, or that the agent intended no wrong, or that the other party acted in good faith. The double agency is a fraud upon the principal in such case,* contravenes public policy, and the courts will refuse to enforce a contract growing out of such agency or award damages for its breach. Armstrong v. O'Brien, 83 Texas, 635, 19 S. W. 268; Mechem on Agency, § 798."

To the same effect are Braden v. Scherer, 61 Tex. Civ. App. 240, 128 S. W. 1159; Moore v. Kelley, 162 S. W. 1035, in which writ of error was refused by the Supreme Court, 107 Tex. 715, 170 S. W. xviii; Keitt v. Gresham, 174 S. W. 886.

What has been said covers the questions raised in all the assignments; hence they have not been separately discussed. No such error as would justify a reversal having been pointed out, an affirmance has been ordered.

Affirmed.